Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Charles P. Kocoras | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 7934 | **DATE** | 10/22/2003 |
| **CASE TITLE** | Frieri vs. CSX Transportation, Inc. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Ruling held. **ENTER MEMORANDUM OPINION:** CSX's motion (Doc 30-1) for summary judgment is denied. Defendant's motion (Doc 42-1) to strike is moot. Parties are given to November 12, 2003 to answer each other's motions in limine. Replies are due November 26, 2003. The Court will rule by mail.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | |
|---|---|---|---|---|
| | No notices required. | | number of notices | **Document Number** |
| | Notices mailed by judge's staff. | | OCT 2 2 20[ ] | |
| | Notified counsel by telephone. | | date docketed | |
| ✓ | Docketing to mail notices. | | docketing deputy initials | |
| | Mail AO 450 form. | U.S. DISTRICT COURT CLERK | | 44 |
| | Copy to judge/magistrate judge. | 03 OCT 22 PM 2: 27 | date mailed notice | |
| SCT | courtroom deputy's initials | Date/time received in central Clerk's Office | mailing deputy initials | |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MICHAEL FRIERI,                )
                               )
              Plaintiff,       )
                               )
    vs.                        )    01 C 7934
                               )
CSX TRANSPORTATION, INC.,      )
                               )
              Defendant.       )    OCT 22 2003

## MEMORANDUM OPINION

CHARLES P. KOCORAS, Chief District Judge:

This matter comes before the court on Defendant CSX Transportation, Inc.'s ("CSX") motion for summary judgment. For the reasons set forth below, the motion is denied.

## BACKGROUND

Plaintiff Michael Frieri ("Frieri") was born in 1952 and began working in the railroad industry, as a police officer, in 1974. In 1980 Frieri started working in the claims department for Consolidated Rail Corporation ("Conrail"). In March 1999 Conrail was purchased by CSX, another railroad company. At that time Frieri became a CSX employee, assuming the position of senior claims representative. As a senior claims representative, Frieri was responsible for investigating accidents, injuries, or

other events that created actual or potential claims against CSX. Frieri's job duties consisted of both sedentary office work and trips "into the field" for investigation. These field investigations entailed walking, at times more than one mile, over such terrain as embankments, railroad tracks, and other uneven ground.

Prior to becoming a CSX employee, Frieri had a history of ailments in his back and left leg. In 1969, Frieri injured his left knee playing basketball, which resulted in a physician draining the knee. In 1993, Frieri experienced a number of injuries to his back, which continues to bother him to the present. He first hurt his back in March 1993, when he slipped while walking on ice. In July 1993 he injured a disk while jogging and his back was aggravated again following a September car accident in which Frieri was rear ended. In November 1993, Frieri underwent surgery to improve his back condition. For at least two years following this surgery Frieri had steroid injections in his back. Around the time of the surgery, scar tissue had formed on nerve roots in Frieri's back which caused him pain in his left leg and knee. Medical examinations, conducted in the mid-1990s, indicated that Frieri had disks bulging in his lower back. Because of his back problems, Frieri obtained a special orthopedic chair for his Conrail office. In 1998 a physician informed Frieri that there was "some instability" in his left knee.

As was the case with the other Conrail claims representatives who became CSX employees, Frieri was not given a medical examination at the time he began working for CSX. Frieri's medical file did not come into CSX's claim department until some point substantially after March 1999. In early 1999, before he became a CSX employee, Frieri was visited at his Conrail offices by Kenneth Mettler ("Mettler"), CSX's Claims Field Director. Mettler would become Frieri's immediate supervisor once he started working for CSX. At this meeting Frieri informed Mettler of his back condition, but Frieri did not tell Mettler that his condition would hinder his ability to work for CSX. When Frieri first came to CSX, his office had not yet been constructed so he shared a office room with Mettler. Frieri brought with him to this office the orthopedic chair that he had used at Conrail. Frieri eventually obtained a separate office adjacent to Mettler.

As a senior claims representative, Frieri was responsible for handling all of the duties involved in investigating claims without direct supervision from Mettler. Frieri could set his own schedule and decide when to go investigate a particular incident. However, it is disputed whether Frieri had the discretion to not leave the office for investigations altogether or to choose to leave certain claims uninvestigated.

On May 25, 2000, Frieri went to Ottawa, Illinois, to investigate a claim of property damage along railroad tracks. While attempting to cross the railroad tracks

in order to take photographs, Frieri's left foot slipped. Even though Frieri was concerned that he had injured his left knee, he proceeded over the tracks, took the photographs, and recrossed the tracks before returning to his car for the drive back to his office. Following this incident Frieri's left knee swelled, causing him to partially limp and be unable to fully bend the knee. While Frieri was aware of a CSX rule that required the filing of an injury report for the purpose of providing medical attention, he did not file a report following this injury. However, Frieri claims to have verbally reported this injury the next week, telling Mettler that he had hurt his knee badly and inquiring how to seek medical care under his CSX health plan. Frieri did not tell Mettler the circumstances of his injury or that it had occurred on the job. According to Frieri, this was because of his fear that he would be medically disqualified from his job if CSX found out that his injury was employment related. Frieri later visited his primary care physician, who referred him to Dr. Surender Dhiman, an orthopedic surgeon. Frieri did not tell either of these physicians that he had been injured while working for CSX. He told Dr. Dhiman that he began feeling pain in his leg in 1998, that his leg and back constantly bothered him, and that for some time he had difficulty squatting and climbing stairs.

Following the Ottawa injury, Frieri refused to investigate claims in the field until July 19, 2000. On that date, Mettler informed Frieri of a railroad accident in Suman,

Indiana, that needed to be investigated. It is disputed whether Mettler merely requested or formally directed Frieri to investigate the accident, but on July 19, 2000, Frieri traveled with a contingent of CSX employees to investigate the Suman accident. Frieri did not tell Mettler that he would be unable to investigate but claims that Mettler noticed that he was walking with a limp. At the Suman accident site, Frieri walked "probably a couple miles" of railroad track that resulted in his knee becoming swollen and painful. Frieri did not file an injury report concerning his swollen knee. He later presented Mettler with a copy of an MRI report from Dr. Dhiman, showing damage to the knee, but Mettler did not look at the report.

On August 22, 2000, Frieri had arthroscopic surgery on his left knee, performed by Dr. Dhiman. The surgery was intended to "clean up" a long-standing arthritic condition in Frieri's left knee. From the time that he first saw Frieri, on July 10, 2000, until the date of his surgery, Dr. Dhiman did not restrict Frieri from working for CSX. After the arthroscopic surgery, Frieri was off work for seven days. When Frieri returned to work, Dr. Dhiman placed no formal restrictions on Frieri's employment activities. Around the time of his surgery, Frieri telephoned Tom Eason, one of Mettler's superiors, and informed him of the situation regarding his injured knee.

In early September 2000, Frieri and Mettler went to investigate an accident that occurred on railroad tracks in Chicago Heights, Illinois. Frieri did not indicate to

Mettler that he was unable to investigate the accident. However, Frieri reported to work that day limping and using an ice pack on his knee. Following ninety minutes of investigating the accident, Frieri again experienced pain in his knee and was sent back to the office by Mettler. Once again, Frieri did not file an injury report with CSX but did complain to Mettler about his inability to investigate claims in the field.

In early October 2000, Frieri went to a rail yard in Chicago to meet with an attorney who was investigating certain rail engines. This incident entailed Frieri walking at least a mile through a rail yard, after which his knee became swollen and Frieri was "laid up" for the weekend. Once again Frieri did not file an injury report.

During September and October of 2000, Frieri conducted field investigations on four or five occasions which he claims resulted in him injuring or aggravating his knee. Frieri did not file injury reports after these incidents but refused to go out into the field during November 2000.

On November 17, 2000, at Frieri's request, Dr. Dhiman issued written instructions restricting Frieri from performing various activities that Frieri might encounter at work, including walking on uneven surfaces, climbing, and squatting. Soon thereafter, Mettler received these written instructions. This initiated a review of Frieri's condition by CSX, which included consultations with Dr. Dhiman, that lasted until early January 2001.

In mid-December 2000, Frieri went to investigate a railroad accident in Gary, Indiana. It is disputed whether Mettler directed Frieri to conduct the Gary investigation or whether it was initiated by Frieri on his own accord. Once again Frieri's knee became swollen but he did not file an injury report.

In late January, after consulting with Dr. Dhiman, CSX determined that Frieri would be unable to continue working as a senior claims representative. Following a vacation, Frieri was placed on long-term disability by CSX on February 5, 2001. By being placed on long-term disability, Frieri ceased working at CSX, which extended Frieri certain benefits for two years, including paying his regular salary for six months followed by paying sixty percent of his salary for the remaining eighteen months. At the end of this period, on February 5, 2003, Frieri was deemed retired by CSX. Frieri continues to receive monthly benefits from CSX.

Frieri's knee condition did not improve after he left CSX in January 2001 and in February 2002, Frieri had surgery totally replacing his left knee. The facts are disputed concerning the impact of Frieri's various field investigations on the overall condition of his left knee, but Frieri and his physicians claim that each trip into the field

from July through December 2000 resulted in further aggravation and harm to Frieri's knee.[1]

On October 15, 2001, Frieri filed the present lawsuit under the Federal Employers' Liability Act, 45 U.S.C. §§ 51-60, ("FELA"). In particular, Frieri alleges that, after being informed of his leg and back conditions, CSX negligently assigned him to his various railroad investigations.[2] Frieri claims that CSX's negligence caused injuries to his back, knee, and legs. CSX moves for summary judgment.

---

[1] CSX asks this court to strike the affidavit of Dr. Dhiman, specifically his conclusions as to the causal connection between Frieri's field investigations and his knee injuries. CSX claims that Dr. Dhiman's affidavit directly contradicts his prior deposition testimony. Upon examination of Dr. Dhiman's deposition testimony and subsequent affidavit, we do not find that Dr. Dhiman's affidavit (stating that Frieri's field investigations accelerated his need for knee replacement surgery) directly contradicts his early deposition testimony. CSX's motion to strike is accordingly denied. In addition, CSX moves to strike the affidavit of Frieri as being contradictory to his prior deposition testimony. Because this court did not rely on Frieri's affidavit in compiling the background facts for this opinion, CSX's motion is denied as moot.

[2] Frieri's original complaint alleged that CSX also negligently failed to conduct adequate medical examinations and failed to place reasonable work restrictions on Frieri. However, in light of Frieri's statements in his Answering Memorandum narrowing his claims to negligent assignment (¶¶ 10-12), Frieri's other non-assignment claims are deemed abandoned. For other examples of a plaintiff abandoning claims through Summary Judgment Response Briefs, see Pickett v. Ingalls Memorial Hosp., 2001 WL 1155276, *6, FN 4 (N.D. Ill. 2001); Huizenga v. Elkay Mfg., 2001 WL 640973, *2 (N.D. Ill. 2001).

## LEGAL STANDARD

Summary judgment is appropriate when the record, viewed in the light most favorable to the non-moving party, reveals that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). On summary judgment the moving party must identify "those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). This initial burden may be satisfied by presenting specific evidence on a particular issue or by pointing out "an absence of evidence to support the nonmoving party's case." Id. at 325. Once the movant has met this burden, the non-moving party cannot simply rest on the allegations in the pleadings, but, "by affidavits or as otherwise provided for in [Rule 56], must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The court must consider the record as a whole in a light most favorable to the non-moving party and draw all reasonable inferences in favor of the non-moving party. Id. at 255; Bay v. Cassens Transport Corp., 212 F.3d 969, 972 (7th Cir. 2000).

## DISCUSSION

### I. FELA

Enacted in 1908 at the heyday of American steam railroads, FELA provides a broad federal tort remedy for railroad workers injured on the job. Williams v. Nat'l R.R. Passenger Corp., 161 F.3d 1059, 1061 (7th Cir. 1998). Under FELA, "[e]very common carrier by railroad . . . shall be liable in damages to any person suffering injury while he is employed . . . for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier." 45 U.S.C. § 51; Walker v. Northeast Reg'l Commuter R.R. Corp., 225 F.3d 895, 897 (7th Cir. 2000). FELA differs from traditional workers' compensation statutes in that it requires employees to prove negligence on the part of the railroad. Kossman v. Northeast Reg'l Commuter R.R. Corp., 211 F.3d 1031, 1035 (7th Cir. 2000). However, the Supreme Court has held that the negligence standard is relaxed in FELA cases such that the plaintiff, "in order to get his case to the jury, need only produce evidence which demonstrates that the 'employer['s] negligence played any part, even the slightest, in producing the injury.'" Id. (quoting Consolidated Rail Corp. v. Gottshall, 512 U.S. 532, 543 (1994)). Because courts have "interpreted [FELA] liberally in light of its humanitarian purposes," Williams, 161 F.3d at 1061, a FELA plaintiff carries a lighter burden than a plaintiff in an ordinary negligence case.

Kossman, 211 F.3d at 1035. Commenting on this lowered burden, the Seventh Circuit has noted that "numerous FELA actions have been submitted to a jury based upon . . . tenuous proof–evidence scarcely more substantial than pigeon bone broth." Harbin v. Burlington Northern R.R. Co., 921 F.2d 129, 132 (7th Cir. 1990).

Even though it requires a lower quantum of evidence to demonstrate negligence, FELA "is not a an insurance statute." Gottshall, 512 U.S. at 554. For this reason, "a FELA plaintiff who fails to produce even the slightest evidence of negligence will lose at summary judgment." Williams, 161 F.3d at 1061-62. Specifically, a FELA plaintiff must provide evidence establishing the common law elements of negligence, including duty, breach, causation, and foreseeability. Id. at 1062. Because FELA holds railroads to a prudent person standard of care, a plaintiff attempting to demonstrate that the railroad breached its duty must show circumstances that "a reasonable person would foresee as creating a potential for harm. Id. (quoting McGinn v. Burlington Northern R.R. Co., 102 F.3d 295, 298 (7th Cir. 1996).

## II. Negligent Assignment

Under FELA a railroad has a duty to assign employees to work which they are reasonably suited and breaches that duty if it negligently assigns an employee to perform work beyond its capacity. Fletcher v. Union Pacific R.R. Co., 621 F.2d 902, 909 (8th Cir. 1980); Fulk v. Ill. Central R.R. Co., 22 F.3d 120, 125 (7th Cir. 1994)

(citing Fletcher at 909); Guzzo v. Northeast Ill. Regional R.R. Corp., 1996 WL 131730, *6 (N.D. Ill. 1996) (citing Fletcher at 909). Both Frieri and CSX are in agreement that a question of negligent assignment turns on foreseeability, as a railroad will be found negligent if it "knew or should have known that its assignment exposed the employee to an unreasonable risk of harm." Fletcher at 909. In determining whether an injury is "reasonably foreseeable" in the FELA context, the Seventh Circuit has applied Judge Learned Hand's formula for negligence. See Reardon v. Peoria & Pekin Union Railway Co., 26 F.3d 52, 53-54 (7th Cir. 1994) (citing United States v. Carroll Towing Co., 159 F.2d 169, 173 (2d Cir. 1947); Williams, 161 F.3d at 1062. Under the Hand formula, an injury is not "foreseeable" if the costs of precautions to prevent the injury exceed the costs of the injury multiplied by the probability of the injury occurring if the precautions are not taken. Reardon at 53-54; Williams at 1062. However, regardless of whether Hand's algebraic approach or the traditional "knew or should have known" foreseeability analysis is applied, the question is one of fact that should be decided by a jury. Fletcher at 909; McCarty v. Pheasant Run, Inc., 826 F.2d 1554, 1557 (7th Cir. 1987); Moreno v. Grand Victoria Casino, 94 F. Supp. 2d. 883, 894 (N.D. Ill. 2000).

## III. Frieri's Case

In light of FELA's relaxed evidentiary standard we conclude that Frieri has produced sufficient evidence to create triable issues of fact as to his claims of negligent assignment. Even though the facts are disputed concerning CSX's knowledge of the causes or extent of Frieri's knee injuries prior to his field investigations from July through December 2000, the record indicates that CSX was aware that Frieri was experiencing knee problems during that period. By early June 2000, Frieri had reported to Mettler that he had injured his knee. Mettler was aware that from May 25 through July 19, 2000, Frieri was refusing to investigate claims in the field. Both Mettler and his superior Tom Eason were aware of Frieri's August 22, 2000, arthroscopic knee surgery. Mettler was with Frieri during the early September 2000 Chicago Heights investigation when Frieri again aggravated his knee. By late November 2000, Mettler had received Dr. Dhiman's instructions restricting Frieri's activities. In addition to these specific incidents, Mettler and Frieri either shared an office or worked in adjacent offices for the entire period in question. This close daily proximity and interaction would provide Mettler numerous opportunities to witness Frieri using his orthopedic chair, walking with a limp, using an ice pack, or complaining about his knee. Based on this evidence, a reasonable jury could determine

that it was foreseeable to CSX that assigning Frieri to conduct field investigations could cause harm to his left knee.

As Frieri points out, his case is quite similar to that of the plaintiff in Moreno, 94 F. Supp. 2d 883, where a riverboat casino employee injured her knee while filling coins into a slot machine. Even though she voiced objections that such work aggravated her knee injury, the Moreno plaintiff was subsequently ordered to perform more slot machine refills, which further injured her knee, which eventually required arthroscopic surgery. Id. at 895. As in Frieri's case, the facts were disputed concerning the degree of her employer's awareness of the injury during the period when she was assigned to fill the slot machines. Id. at 896. However, the Moreno court held that the plaintiff had presented sufficient evidence such that a reasonable jury could find that the casino was aware of the injury to preclude granting summary judgment to the defendant. Id.

Defendant claims that Moreno is distinguishable on the grounds that it involves a claim under the Jones Act, 46 U.S.C. § 688 *et seq*, rather than under FELA.[3]

---

[3] CSX also claims that Frieri's case is distinguishable from Moreno because the Moreno plaintiff was under medical restrictions at the time of her injury and subsequent assignments while Frieri was not. However, a close reading of Moreno shows that the plaintiff was not placed on any medical restrictions until after the surgery that had resulted from her knee injuries, Moreno, 94 F. Supp. 2d at 887-889, making her situation rather analogous to Frieri's.

However, the Jones Act is a statute designed to protect maritime workers, and makes applicable to seamen injured in the course of their employment the relevant provisions of FELA. Greenwell v. Aztar Indiana Gaming Corp., 268 F.3d 486, 489 (7th Cir. 2001). In particular, plaintiffs bringing Jones Act negligence claims are entitled to the same lighter evidentiary burden as FELA plaintiffs. See Bavaro v. Grand Victoria Casino, 2001 WL 289782, *1-2 (N.D. Ill. 2001). In addition, Moreno, in its negligent assignment analysis, relies heavily on Fletcher, 621 F.2d 902, a FELA case which CSX itself cites as a standard for analyzing FELA negligent assignment claims. See Def.'s Mot. for Summ. J. at 6. Because of this interchangeability between FELA and the Jones Act in negligent assignment analyses, we cannot agree that with CSX that Moreno is distinguishable simply because it involves a Jones Act claim.

CSX next argues that because Frieri lied to his supervisors about the source of his knee problems, it was not foreseeable to CSX that Frieri's field examinations could result in damage to his knee. CSX points to a Missouri state court case, White v. Union Pacific R.R. Co, 871 S.W.2d 50, for the proposition that misrepresenting an employee's medical condition to his employer precludes a finding of foreseeability when the employee is subsequently injured from an employment assignment that would not have been made had the employer known of the employee's true condition.

Although Frieri's lies and other deceptions are highly disturbing, they are but one consideration in the total factual fabric of the case.

In any event, one of Frieri's field investigations occurred in December 2000, after CSX had received written medical restrictions from Dr. Dhiman. These instructions prohibited Frieri from such activities as walking and climbing on uneven surfaces, exertions that would normally be encountered on a field investigation. Once CSX became aware of Frieri's medical restrictions, the foreseeability of harm to his knee that would result from subsequent field investigations certainly increases. That being said, this court carries considerable doubt as to the strength of Frieri's case. He told neither CSX nor his own physician about his May 25, 2000, on-the-job injury, which he claims triggered the subsequent damage to his knee. Concerning many of the field investigations that Frieri says aggravated his injury, it appears that he initiated them on his own accord, rather than being directed into the field by his superiors. The facts are highly disputed whether Frieri's field investigations actually resulted in damage to his knee.

However tenuous Frieri's case may be, the evidence that he provides is substantial enough to satisfy the lax, plaintiff-friendly "pigeon bone broth" standard that has been established for FELA negligence cases. Harbin, 921 F.2d at 132. The key issues in this case (the degree and timing of CSX's awareness of Frieri's injury,

whether his field investigations caused further damage to his knee, whether Frieri was actually assigned to go out into the field, and, if so, whether it was foreseeable to CSX that Frieri's field investigations could harm his knee) are disputed. Because Frieri has produced sufficient evidence at this point to create triable issues of fact on material elements of his negligent assignment claims, CSX's motion for summary judgment is denied.

## CONCLUSION

Based on the foregoing analysis, CSX's motion for summary judgment is denied.

Charles P. Kocoras
Chief Judge
United States District Court

Dated: OCT 2 2 2003